In the Matter of the Application of GEORGE McANENY, LEROY T. HARKNESS and JOHN F. O'RYAN, Constituting the TRANSIT COMMISSION, Petitioners, for an Order Requiring the BOARD OF ESTIMATE AND APPORTIONMENT OF THE CITY OF NEW YORK, Respondents, to Appropriate the Sum of Money Certified by Such Commission to Be Necessary to Properly Enable It to Do and Perform or Cause to Be Done and Performed the Duties Imposed upon It for the Period from April 26 to June 30, 1921. (Application No. 1.)

In the Matter of the Application of GEORGE McANENY, LEROY T. HARKNESS and JOHN F. O'RYAN, Constituting the Transit Commission, Petitioners, for an Order Requiring the Board OF ESTIMATE AND APPORTIONMENT OF THE CITY OF NEW YORK, Respondents, to Appropriate the Sum of Money Certified by Such Commission to Be Necessary to Properly Enable It to Do and Perform or Cause to Be Done and Performed the Duties Imposed upon It for the Period from July 1 to December 31, 1921. (Application No. 2.)

First Department, July 1, 1921.

**Public Service Commissions — Laws of 1921, chapter 134, amending Public Service Commissions Law and creating Transit Commission in city of New York constitutional — general and not special city bill — appointment of Transit Commissioners by Governor — payment of employees of Commission — power of Commission to modify rates fixed in local franchises.**

Chapter 134 of the Laws of 1921, entitled "An act to amend the Public Service Commissions Law, in relation to creating the Public Service Commission and the Transit Commission, defining the jurisdiction, powers and duties of such Commissions, and abolishing the Public Service Commission of the First District, the Public Service Commission of the Second District and the office of Transit Construction Commissioner," is a general act and not a special city bill and, therefore, it was not necessary to send the same to the mayor of the city of New York for action as provided by section 2 of article 12 of the Constitution.

The provision of said act for the appointment of Transit Commissioners by the Governor does not offend section 2 of article 10 of the Constitution, providing that "all city, town and village officers whose election or appointment is not provided for in this Constitution shall be elected by the electors of such cities, towns and villages, or of some division

thereof or appointed by such authorities thereof as the Legislature shall designate for that purpose."

There is no constitutional objection to the mandatory provisions of said amendment to the Public Service Commissions Law, providing for the payment of salaries and expenses of the employees of the Commission.

The provision giving power to the Commission to determine the just and reasonable rates, fares and charges as the maximum to be charged, "notwithstanding that a higher or lower rate, fare or charge has been heretofore prescribed by general or special statute, *contract, grant, franchise condition, consent or other agreement*, and shall fix the same," etc., does not offend subdivision 1 of section 10 of article 1 of the Federal Constitution, providing that "No State shall   *   *   *   pass any   *   *   *   law impairing the obligation of contracts."

APPLICATIONS by the petitioners, George McAneny and others, constituting the Transit Commission, pursuant to section 14 of the Public Service Commission Law, chapter 48 of the Consolidated Laws (Laws of 1910, chap. 480), as amended by section 19 of chapter 134 of the Laws of 1921, for orders requiring the board of estimate and apportionment to make certain appropriations for which the Transit Commission had theretofore made requisition.

*Francis M. Scott* of counsel [*Godfrey Goldmark*, attorney], for the petitioners.

*Hiram M. Johnson* of counsel [*John P. O'Brien* and *Edgar J. Kohler* with him on the brief; *John P. O'Brien, Corporation Counsel*, attorney], for the respondents Board of Estimate and Apportionment.

CLARKE, P. J.:

Chapter 134 of the Laws of 1921 amends chapter 48 of the Consolidated Laws (Laws of 1910, chap. 480), the Public Service Commissions Law.* Section 8 amends section 4 of such chapter, as amended by chapter 263 of the Laws of 1919, and provides that there shall be a Public Service Commission which shall possess the powers and duties thereinafter specified and also all powers necessary or proper to enable it to carry out the purposes of this chapter. The Commission shall consist of five members, to be appointed by the Governor, by and with the advice and consent of the Senate. Section 9 amends said

---

* Short title was changed in 1921 to Public Service Commission Law.—[REP.

chapter by inserting therein a new section to be section 4a which provides:

" There shall be a Transit Commission for cities containing a population of more than one million inhabitants, according to the last preceding Federal census or State enumeration, which shall possess the powers and duties hereinafter specified, and also all powers necessary or proper to enable it to carry out the purposes of this chapter. The Commission shall consist of three members to be appointed by the Governor, by and with the advice and consent of the Senate."

Section 10 amends section 5 of such chapter, as theretofore amended, and provides that " The jurisdiction, supervision, powers and duties of the Public Service Commission shall extend under this chapter : 1. To common carriers, railroads, street railroads and stage or omnibus lines or routes, and to the persons or corporations owning, leasing or operating the same, except as jurisdiction thereof is conferred by this chapter on the Transit Commission. 2. To the manufacture, sale or distribution of gas and electricity for light, heat or power, to gas plants and to electric plants and to the persons or corporations owning, leasing or operating the same. 3. To the manufacture, holding, distribution, transmission, sale or furnishing of steam for heat or power, to steam plants and to the persons or corporations owning, leasing or operating the same. 4. To every telephone line which lies wholly within the State of New York and that part within the State of New York of every telephone line which lies partly within and partly without the State of New York and to the persons or corporations owning, leasing or operating any such telephone line. 5. To every telegraph line which lies wholly within the State of New York and that part within the State of New York of every telegraph line which lies partly within and partly without the State of New York and to the persons or corporations owning, leasing or operating any such telegraph line. 6. To every stock yard within the State and to the stock yard company owning, leasing or operating the same, to the same extent and in respect to the same objects and purposes as such jurisdiction extends, under the provisions of this chapter, to depots, freight houses and shipping stations of a common carrier, including the duty of such stock yard com-

pany to submit reports and be subjected to investigation as if it were a common carrier, and the powers and duties of such commission to fix charges and make and enforce orders relating to adequate service by such company.　*　*　*."

Section 11 amends such chapter by inserting therein a new section, to be section 5a, to read as follows:

"The jurisdiction, supervision, powers and duties of the Transit Commission shall extend under this chapter: 1. To railroads, street railroads and stage or omnibus lines or routes lying exclusively within a city containing a population of over one million inhabitants according to the last preceding Federal census or State enumeration; and to the persons or corporations owning, leasing or operating the same; 2. To street railroads any portion of whose lines lies within such city, and to the persons or corporations owning, leasing or operating the same; 3. To stage or omnibus lines or routes any portion of which lies within such city, and to the persons or corporations owning, operating or leasing the same; 4. To such portion of any railroad as lies within such city and is used for local service and not operated as part of a trunk line railroad, and to the persons or corporations owning, operating or leasing the same; 5. To any other railroads any portion of whose lines lies within such city, which are operated by a trunk line railroad principally for the local transportation of persons and property, and to the persons or corporations owning, operating or leasing the same; 6. To matters or subjects jurisdiction whereof is conferred on such Commission by article six of this chapter."

Section 19 amends section 14 of such chapter as last amended by chapter 520 of the Laws of 1919 to read as follows:

"*　*　* 2. The salaries of the Commissioners, secretary and counsel of the Transit Commission shall be audited and allowed by the State Comptroller, and paid monthly by the State Treasurer upon the order of the Comptroller out of the funds provided therefor. All other salaries and expenses of the Transit Commission shall be chargeable to the city in which such Commission has jurisdiction and shall be audited and paid as follows: The board of estimate and apportionment or other board or public body on which is imposed a duty, and in which is vested the power, of making appropriations

of public moneys for the purposes of the city government in such city shall, from time to time, on requisition duly made by the Transit Commission, appropriate such sum or sums of money as such Commission shall certify to be necessary to properly enable it to do and perform, or cause to be done and performed, the duties imposed upon it. Such appropriation shall be made forthwith upon presentation of such a requisition without revision or reduction and without the imposition of any conditions or limitations by such board or body, and such appropriation by it is hereby declared to be a ministerial act. If such board or body shall fail to appropriate such amount as such Transit Commission shall deem requisite and necessary, such Commission may apply to the Appellate Division of the Supreme Court in the First Judicial Department, on notice to such board or body, for an order requiring such board or body to make such appropriation. The city shall not be liable for any indebtedness incurred by such Commission in excess of such appropriation or appropriations. It shall be the duty of the comptroller or other chief fiscal officer of such city, after such appropriation shall have been duly made, to audit and pay the salaries and expenses of such Commission chargeable to the city, upon vouchers therefor. For the purpose of providing funds with which to pay the said sums, the comptroller or other chief financial officer of said city, is hereby authorized and directed to issue and sell revenue bonds of such city in anticipation of receipt of taxes and out of the proceeds of such bonds to make the payments in this section required to be made. The amount necessary to pay the principal and interest of such bonds shall be included in the estimates of moneys necessary to be raised by taxation to carry on the business of said city, and shall be made a part of the tax levy for the year next following the year in which such appropriations are made."

Section 19a provides that subdivision 1 of section 16 of such chapter, as amended by chapter 528 of the Laws of 1920, is hereby amended to read as follows:

" 1. All proceedings of each Commission and all documents and records in its possession shall be public records, and each Commission shall make an annual report, to the Legislature

on or before the second Monday of January in each year, which shall contain any information in the possession of the Commission which it shall deem of value to the Legislature and the People of the State."

By subsequent provisions of the act of 1921 (amdg. Pub. Serv. Comm. Law, § 45 *et seq.*) each Commission was given general supervision of all common carriers, railroads, street railroads, railroad corporations and street railroad corporations subject to its jurisdiction as hereinbefore defined and shall have the power of inspection of physicial property and to conduct investigations or hearings, and shall have power to examine books, records, documents and papers, to investigate accidents and complaints and to determine the just and reasonable rates, fares and charges to be made.

The Transit Commission delivered to the board of estimate and apportionment a requisition for $368,895.70 under the provisions of chapter 134 of the Laws of 1921, " which sum said Transit Commission hereby certifies is necessary to properly enable it to do and perform or cause to be done and performed for the period from April 25th to June 30th, 1921, the duties imposed upon said Commission by said law," and also a similar requisition for the sum of $1,083,327, " which sum said Transit Commission hereby certifies is necessary to properly enable it to do and perform or cause to be done and performed for the six months ending December 31, 1921, the duties imposed upon said Commission by said law." This requisition not having been honored by the board of estimate and apportionment, the said Transit Commission applied to this court, on notice to such board, for an order requiring it to make such appropriations.

For many years the question of transportation of passengers has been a matter of legislative concern. So far as the peculiar problems presented by the physicial configuration of the old city of New York, located on a long narrow island, necessitating a morning down and afternoon upflowing of the tide of travel, a board of inquiry investigation and plan was authorized as early as 1875. Finally the Rapid Transit Act and amendments thereto (Laws of 1891, chap. 4, as amd. by Laws of 1892, chaps. 102, 556; Laws of 1894, chaps. 528, 752, and Laws of 1895, chap. 519) were passed and their constitutionality came

before the courts and they were sustained in *Sun Publishing Assn.* v. *Mayor* (8 App. Div. 230; affd., 152 N. Y. 257).

Chapter 752 of the Laws of 1894 amended section 1 of chapter 4 of the Laws of 1891 as follows: " In each city having over one million of inhabitants, according to the last preceding National or State census, there shall be a Board of Rapid Transit Railroad Commissioners in and for such city, which shall consist of the mayor of such city, the comptroller or other chief financial officer of such city, the president of the Chamber of Commerce of the State of New York, by virtue of his office, and the following named persons, to-wit: William Steinway, Seth Low, John Claflin, Alexander E. Orr and John H. Starin."

It was further provided: " Vacancies which may take place in the offices so held by the persons specifically named herein as such commissioners shall be filled by a majority vote of the remaining members of said board."

That is, the Legislature itself appointed the commissioners.

The act of 1894 amended section 10 of the act of 1891 as follows: " The board of estimate and apportionment or other board or public body on which is imposed the duty, and in which is vested the power, of making appropriations of public moneys for the purposes of the city government in any city in which it is proposed to construct such railway or railways shall, from time to time, on requisition duly made by the Board of Rapid Transit Railroad Commissioners, appropriate such sum or sums of money as may be requisite and necessary to properly enable it to do and perform, or cause to be done and performed, the duties herein prescribed, and to provide for the compensation of such Commissioners, and such appropriation shall be made forthwith upon presentation of a requisition from the Board of Rapid Transit Railroad Commissioners, which shall state the purposes for which such moneys are required by the said Board. In case the said board of estimate and apportionment or such other board or public body fail to appropriate such amount as the Board of Rapid Transit Railroad Commissioners deem requisite and necessary, the said Board of Rapid Transit Railroad Commissioners may apply to the General Term of the Supreme Court, in the department in which the railway is to be or has been constructed, on notice to the board of estimate

and apportionment, or such other board or public body aforesaid, to determine what amount shall be appropriated for the purposes required by this section, and the decision of said General Term shall be final and conclusive; * * *. It shall be the duty of the auditor and comptroller of any such city, after such appropriation shall have been duly made, to audit and pay the proper expenditures and compensation of said Commissioners upon vouchers therefor, to be furnished by the said Commissioners, which payments shall be made in like manner as payments are now made by the auditor, comptroller, or other public officers, of claims against and demands upon such city; and for the purpose of providing funds with which to pay the said sums, the comptroller or other chief financial officer of said city is hereby authorized and directed to issue and sell revenue bonds of such city in anticipation of receipt of taxes, and out of the proceeds of such bonds to make the payments in this section required to be made. The amount necessary to pay the principal and interest of such bonds shall be included in the estimates of moneys necessary to be raised by taxation to carry on the business of said city, and shall be made a part of the tax levy for the year next following the year in which such appropriations are made."

The principal question presented in *Sun Publishing Assn.* v. *Mayor* (*supra*) was whether the act violated the constitutional provision that no county, city, town or village shall "be allowed to incur any indebtedness except for county, city, town or village purposes." (Const. art. 8, § 10.) The courts held it did not, that the proposed road "may properly be held to be 'for a city purpose.'"

Mr. Justice BARRETT, writing for the Appellate Division upon the question raised as to the method of appointment of the commissioners — after stating that "the functions of these boards are strictly local. Their primary function is to consider and determine whether it is for the interest of the public, and of the city in which each is appointed, that a rapid transit railway should be established therein. (§ 4.) They act, in fact, for the particular city throughout. They acquire property for it. They sue in its name and on its behalf. They are even spoken of in the act as the city's board of rapid transit commissioners (§ 34)," further said: "The

office of rapid transit commissioner was not in existence at the time when the Constitution, which is said to have been violated by the manner in which the present rapid transit commissioners were appointed, went into effect. It has been repeatedly held that the provisions of this Constitution, with regard to the election or appointment of city, town or village officers, related solely to offices which were in existence at the time of its adoption. [*People ex rel. Kingsland* v. *Palmer*, 52 N. Y. 83; *People ex rel. Wood* v. *Draper*, 15 id. 532; *People* v. *Pinckney*, 32 id. 377.] As to officers whose offices might thereafter be created by law, the provision was that they should be elected by the people, or appointed as the Legislature might direct. As to such new offices, it has been held that the legislative power is not in any wise restricted." Thereafter the first subway was contracted for, built and put into operation under said board of rapid transit commissioners. The general agitation, both National and State, for control and regulation of public utility corporations, which resulted in the passage of the Interstate Commerce Act (24 U. S. Stat. at Large, 379, chap. 104) and amendments thereto by the Congress, and controlling legislation in many of the States, finally resulted, in 1907, in the enactment in this State of the Public Service Commissions Law (Laws of 1907, chap. 429), which was revised, amended and created chapter 48 of the Consolidated Laws by chapter 480 of the Laws of 1910. The act divided the State into two public service districts, the first to include the counties of New York, Kings, Queens and Richmond (after its creation Bronx was added thereto),* the second, all other counties of the State, and provided for two Commissions of five members each, to be appointed by the Governor with the advice and consent of the Senate, each Commissioner to be a resident of the district for which appointed. The jurisdiction, supervision, powers and duties of the Commission in the First District were extended to the railroads and street railroads in said district, to common carriers operating exclusively therein, to the manufacture, sale or distribution of gas and electricity for light, heat and power in said district, and in addition

---

* See Laws of 1916, chap. 422, amdg. Consol. Laws, chap. 48 (Laws of 1910, chap. 480), § 3. See, also, Laws of 1912, chap. 548, § 11.— [REP.

thereto it should have and exercise all powers theretofore conferred upon the Board of Rapid Transit Railroad Commissioners under chapter 4 of the Laws of 1891, and the acts amendatory thereto. All jurisdiction not specifically granted to the Commission of the First District was vested in the Commission of the Second District. The Board of Railroad Commissioners, the Commission of Gas and Electricity, the Inspector of Gas Meters and the Board of Rapid Transit Railroad Commissioners were abolished, the powers and duties of said Boards were transferred to the Public Service Commissions, with their records; pending actions and proceedings were saved, to be prosecuted or defended by the Commissions. Section 14 of the act, "Payment of salaries and expenses," provided:

" 1. The salaries of the Commissioners, the counsel to the Commission, and the secretary to the Commission in the First District shall be audited and allowed by the State Comptroller, and paid monthly by the State Treasurer upon the order of the Comptroller out of the funds provided therefor. All other salaries and expenses of the Commission of the First District shall be audited and paid as follows: The board of estimate and apportionment of the city of New York, or other board or public body on which is imposed the duty and in which is vested the power of making appropriations of public moneys for the purposes of the city government shall, from time to time, on requisition duly made by the Public Service Commission of the First District, appropriate such sum or sums of money as may be requisite and necessary to enable it to do and perform, or cause to be done and performed, the duties in this or in any other act prescribed, and to provide for the expenses and the compensation of the employees of such Commission, and such appropriation shall be made forthwith upon presentation of a requisition from the said Commission, which shall state the purposes for which such moneys are required by it. In case the said board of estimate and apportionment, or such other board or public body, fail to appropriate such amount as the said Commission deems requisite and necessary, the said Commission may apply to the Appellate Division of the Supreme Court in the First Department, on notice to the board of estimate and apportionment or such

other board or public body aforesaid, to determine what amount shall be appropriated for the purposes so required and the decision of said Appellate Division shall be final and conclusive; and the city shall not be liable for any indebtedness incurred by the said Commission in excess of such appropriation or appropriations. It shall be the duty of the auditor and comptroller of said city, after such appropriation shall have been duly made, to audit and pay the proper expenses and compensation of the employees of said Commission other than its counsel and secretary, upon vouchers therefor, to be furnished by the said Commission, which payments shall be made in like manner as payments are now made by the auditor, comptroller or other public officers of claims against and demands upon such city; and for the purpose of providing funds with which to pay the said sums, the comptroller or other chief financial officer of said city, is hereby authorized and directed to issue and sell revenue bonds of such city in anticipation of receipt of taxes and out of the proceeds of such bonds to make the payments in this section required to be made. The amount necessary to pay the principal and interest of such bonds shall be included in the estimates of moneys necessary to be raised by taxation to carry on the business of said city, and shall be made a part of the tax levy for the year next following the year in which such appropriations are made."

*Gubner* v. *McClellan* (130 App. Div. 716) was an action brought to restrain the city authorities from paying to any person the moneys required to be paid by section 14 of this act upon the ground that any such payments would be illegal official acts and a waste of the funds of the city. The first point argued was that the act offended section 16 of article 3 of the State Constitution, " No private or local bill, which may be passed by the Legislature, shall embrace more than one subject, and that shall be expressed in the title." This court, after calling attention to sections 15 and 16 of article 3 and to section 2 of article 12 of the Constitution requiring special city bills to be sent to the city affected before final action thereon, said: " While undoubtedly a general bill, yet, in pursuance of the legislative policy to send to the cities affected for greater precaution all bills which, from any point of view, might be claimed

to come within that section of the Constitution, it was so sent. But this act is neither a *private* nor a *local* bill. The general subject of the act is not local, that is, confined to a particular municipality or particular portion of the State. Obviously, it is not a private bill. * * * The scheme of the act is to create public service commissions for the regulation and control of certain public service corporations. Every section of the act bears directly upon the general scheme. * * * The Public Service Commissions Law is a general act the provisions of which cover the whole State. * * * This act is the latest expression of the public policy of the State in reference to public service corporations. The right of the State to regulate and control corporations has always been asserted and recognized; especially so in respect to those corporations upon whom the right to employ the governmental power of condemning private property for public use and the right to use the public streets have been conferred. * * * The salaries and expenses of the Commissions are public burdens met by taxation, and are pure governmental expenses. The fact that the salaries of the Commissioners, their counsel, and the secretary, in the first district, are paid directly from the State treasury, and the other salaries and expenses of the employees of that Commission from the city treasury, does not alter the fact that both are paid for by taxation and for governmental purposes. Upon the distribution of the burden of taxation, the localities upon which placed, the classes of property upon which imposed, there is no prohibitory provision of the State Constitution." The following citations supported the text: *Providence Bank* v. *Billings* (4 Pet. 514); *McCulloch* v. *Maryland* (4 Wheat. 428); *People ex rel. Griffin* v. *Mayor, etc., of Brooklyn* (4 N. Y. 419); *People ex rel. Crowell* v. *Lawrence* (41 id. 137); *Brewster* v. *City of Syracuse* (19 id. 116); *Town of Guilford* v. *Supervisors of Chenango County* (13 id. 143); *Thomas* v. *Leland* (24 Wend. 65); *Howell* v. *City of Buffalo* (4 Trans. App. 505); *Gordon* v. *Cornes* (47 N. Y. 608); *Genet* v. *City of Brooklyn* (99 id. 296) and *Cayuga County* v. *State* (153 id. 279).

The opinion proceeds: " To conclude, the act is general, not private or local, it contains no matter not germane to the title thereof, the provision for payment of the expenses

of the Commissions created is properly included in the act creating them, the provision requiring payment of a portion thereof by taxation upon a specified district is but a matter of apportionment well within the taxing power of the Legislature, and no indebtedness within the meaning of section 10 of article 8 of the Constitution is to be incurred. The act is a valid exercise of legislative power."

In 1910 by chapter 480 the Legislature revised, amended and re-enacted chapter 429 of the Laws of 1907 as " Chapter 48 of the Consolidated Laws — The Public Service Commissions Law." This act was not sent to the city for its action thereon, the Legislature apparently concurring in the opinion of this court, handed down the year previous, that the act was a general act and did not require to be so transmitted.

One of the objections urged against the validity of the act now under consideration, chapter 134 of the Laws of 1921, is that it was not sent to the mayor for action thereon prior to its final passage in violation of the provision of section 2 of article 12 of the Constitution, claiming that it is a special city bill. Upon the printed copy of the act submitted to this court and certified to be correct by the Secretary of State, is the heading " General — All Counties."

It is entitled: " An Act to amend the Public Service Commissions Law, in relation to creating the Public Service Commission and the Transit Commission, defining the jurisdiction, powers and duties of such Commissions, and abolishing the Public Service Commission of the First District, the Public Service Commission of the Second District and the office of Transit Construction Commissioner."

It contains seventy-nine sections amending many sections of the prior law, and adding certain new sections. As this court has held in the *Gubner Case* (*supra*) that the Public Service Commissions Law is general it must follow that acts amending it are also general. It is interesting to note that chapter 263 of the Laws of 1919 amending the Public Service Commissions Law in relation to reorganizing the Commission of the First District by reducing said Commission to one member to be appointed by the Governor, and providing for three deputy commissioners, and making other changes, was approved by Governor Smith without having been trans-

mitted to the city; and that chapter 520 of the Laws of 1919 amending said law and establishing the office of Transit Construction Commissioner and providing by section 107, as added by said act of 1919, that the board of estimate and apportionment "shall, on requisition duly made by the Transit Construction Commissioner, stating the purpose for which such moneys are required, appropriate such sum or sums of money as the board * * * may deem necessary for the payment of the salaries and expenses of his office," was likewise approved by Governor Smith, the bill not having been transmitted to the city. There is no substance to this objection. The act is general and not a special city bill. Another objection is that the act offends section 2 of article 10 of the Constitution, "All city, town and village officers, whose election or appointment is not provided for by this Constitution, shall be elected by the electors of such cities, towns and villages, or of some division thereof, or appointed by such authorities thereof, as the Legislature shall designate for that purpose." The claim is that as the Board of Rapid Transit Railroad Commissioners was in existence at the time of the going into effect of the present Constitution and as they were held in *Sun Publishing Assn. v. Mayor* (8 App. Div. 230), although appointed by the Legislature, to be local officers, their successors must be elected or appointed by such authorities of the city as the Legislature shall designate, and that as upon the Transit Commission has been devolved the powers of the Board of Rapid Transit Railroad Commissioners, their appointment by the Governor is unconstitutional and void. The answer seems simple. The Board of Rapid Transit Railroad Commissioners were appointed by the Legislature to do a specific thing, to devise a plan for a rapid transit road and to carry it out. It built the first subway. It was legislated out of office in 1907 when the Public Service Commissions Law was enacted and took effect, and there were also legislated out of office by the same act the Board of Railroad Commissioners, the Commission of Gas and Electricity and the Inspector of Gas Meters. The powers and duties of such board and officers theretofore conferred and imposed by statute were transferred upon this new commission, divided into two bodies for convenience of administration. But they were entirely new

officials not in existence when the Constitution was adopted with broad powers and wide jurisdiction, occupying a general field, exercising jurisdiction never before possessed, of which the particular duties of the abolished boards and officers were mere details. There were certain permanent provisions of the Rapid Transit Act which it was deemed advisable to retain and so the administration thereof was transferred to this comprehensive commission — and in turn upon the single Transit Construction Commissioner and now upon the Transit Commission. In *People ex rel. Metropolitan St. R. Co.* v. *Tax Commissioners* (174 N. Y. 417) the court had under consideration an act which authorized the assessment or valuation for the purpose of general taxation of all special franchises by a State Board of Tax Commissioners appointed by the Governor. It was attacked as in violation of the home rule provision of the Constitution. Judge VANN said: " Every presumption is in favor of the constitutionality of an act of the Legislature and, if the Constitution and the act can be reasonably construed so as to enable the latter to stand, it is the duty of the courts to give them that construction." Again, " The statute should be considered in the light of the circumstances existing when it was passed, which were extraordinary and unprecedented." Again, " While it is difficult to classify all the authorities relating to the subject of home rule, the most of them fall into convenient groups. At the head of the first class stands the celebrated judgment of Chief Judge DENIO in *People ex rel. Wood* v. *Draper* (15 N. Y. 532). In that case the statute combined four counties into one police district, invested five police commissioners appointed by the Governor, acting as a board with the mayors of two cities in the district, with all the powers previously belonging to certain local officers of said cities respectively. The new board was authorized to appoint and control all the policemen, who were to act in any part of the district, regardless of residence or county lines. The validity of the act was upheld upon the ground that the commissioners thus appointed were not city officers, although it was strongly challenged at the bar and by a vigorous dissenting opinion, as a violation of the home rule provision of the Constitution. Similar acts creating a new system by erecting a metropolitan fire dis-

trict, a metropolitan health district, a metropolitan board of excise and a capital police district, each embracing the territory of two or more municipal divisions of the State, were also sustained, although functions formerly belonging to local officers were transferred to State officials. (*People* v. *Pinckney*, 32 N. Y. 377; *Metropolitan Board of Health* v. *Heister*, 37 N. Y. 661; *Metropolitan Board of Excise* v. *Barrie*, 34 N. Y. 657; *People ex rel. McMullen* v. *Shepard*, 36 N. Y. 285.) * * * Acts authorizing State officials to construct public buildings, parks and highways, the expense of which was to be paid locally, have been uniformly sustained, although the power to make such improvements had been previously vested in the local authorities and it was urged that the transfer of the power was an encroachment upon local self-government. (*People ex rel. McLean* v. *Flagg*, 46 N. Y. 401; *Astor* v. *Mayor, etc., of N. Y.*, 62 N. Y. 567; *People ex rel. Kilmer* v. *McDonald*, 69 N. Y. 362; *People ex rel. Comrs.* v. *Board of Suprs. Oneida Co.*, 170 N. Y. 105.) " See, also, *Matter of Morgan* v. *Furey* (186 N. Y. 202) wherein it is said: " The superintendent, however, is not named in the Constitution, and the essential, as contrasted with the incidental functions of that officer, were unknown when the Constitution was adopted. The office is new not only in name, but in the nature of the powers and duties belonging thereto, and hence, according to the express command of the fundamental law, may be filled through an election by the people or appointment by such authority ' as the Legislature may direct.' "

It seems to me clear that it is too late after fourteen years to revive these alleged rights of the Board of Rapid Transit Railroad Commissioners whose duties were transferred, as mere detail of the entirely new venture in governmental control of public utilities in this State, by the creation of the new office of Public Service Commissioner.

The mandatory provisions for the payment of salaries and expenses of the employees of the Commission is assailed. The charter and the statutes affecting the city are crowded with mandatory provisions. The city is but a subdivision of the State, the Legislature possessing full sovereign power except as limited by the express terms of the Constitution. We have seen that this provision is but an apportionment of

taxation, and in general character it follows the method provided in the Rapid Transit Act and the Public Service Commissions Law. There is no constitutional objection thereto. It is suggested that the contracts 3 and 4 provide for ultimate payment as part of the cost of construction of certain administrative expense. This is a mere matter of detail. The amount so charged is to be determined in the first instance by the engineer. There should be no difficulty whatever in arranging these practical matters in the future as in the past. The vigorous assault upon this act is made because of the following provisions. By section 29 of the act of 1921, subdivision 1 of section 49 of chapter 48 of the Consolidated Laws, as amended by chapter 546 of the Laws of 1911, which gave power to the Commission to determine the just and reasonable rates, fares and charges as the maximum to be charged, " notwithstanding that a higher rate, fare or charge has been heretofore authorized by statute, and shall fix the same," etc., was amended so as to read " notwithstanding that a higher or lower rate, fare or charge has been heretofore prescribed by general or special statute, *contract, grant, franchise condition, consent or other agreement,* and shall fix the same," etc. This provision is claimed to offend subdivision 1 of section 10 of article 1 of the Federal Constitution, " No State shall   *   *   *   pass any   *   *   *   law impairing the obligation of contracts."

In *Matter of Quinby* v. *Public Service Commission* (223 N. Y. 244) the court said: " In the absence of clear and definite language conferring without ambiguity jurisdiction upon the Public Service Commission to increase rates of fare agreed upon by the street railroad and the local authorities we should not unnecessarily hold that the Legislature has intended to delegate any of its powers in the matter, whatever its powers may be.   *   *   *   The authority of the Commission to regulate rates in such cases and thus to extinguish an undoubted power of the local authorities should fairly appear before it is assumed to exist."

In *Matter of International R. Co.* v. *Public Serv. Comm.* (226 N. Y. 474) the court said: " The power to regulate rates is the power to increase them if inadequate just as truly as it is the power to reduce them if excessive.   *   *   *   Nor is there anything in the attempted distinction between regu-

lation directly by the Legislature and regulation indirectly through a commission. The Public Service Commission is the delegate of the Legislature; and regulation by the one is regulation by the other. * * * There are times when the police power modifies a contract in spite of the intention of those who have contracted. * * * The Legislature may say that, subject to the condition subsequent annexed to the consent of the locality, there shall be a change of motive power or an increase of the rates. It may say that if the local authorities do not promptly manifest the election to revoke, the condition will be waived. The doubt is whether, going farther, it may wipe out the condition altogether, and transform a consent that was qualified into one that is absolute. * * * In deciding the *Quinby* case, we left that question open, as we leave it open now. * * * We found a limitation of the rate of carriage lawfully imposed by a municipality as one of the conditions of its consent (Railroad Law, sec. 173). We found nothing in the statute expressly authorizing its annulment. * * * In default of ' clear and definite language,' we followed the settled rule that ' a statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score.' "

In *People ex rel. Village of South Glens Falls* v. *Public Serv. Comm.* (225 N. Y. 216) Judge CRANE, writing for the court, alluding to the *Quinby* case, said: " The question as to the power of the Legislature to deal with such rates was specifically reserved and not decided. The opinion clearly intimated that such power did exist." Judge MCLAUGHLIN, concurring, said: " The right to regulate rates of public service corporations is a governmental power vested in the State in its sovereign capacity. It may be exercised by the State, or through a commission appointed by it; or it may delegate such power to a municipality. The delegation of this power, however, is never implied since the effect is to extinguish, no matter for how short a time, *pro tanto* a power of the State. Therefore, when delegated its existence and the authority to make it must clearly and unmistakably appear. * * * Every doubt must be resolved in favor of the continuance of the power in the State."

The act under consideration in clear and definite language "confers power upon the Commission to increase rates." The question left open by those decisions was settled so far as the opinions of a majority of the Court of Appeals can settle a question not necessary to the decision of the particular case in *Matter of City of Niagara Falls* v. *Public Serv. Comm.* (229 N. Y. 333), decided in July, 1920. While that case reaffirmed the *Quinby* case, the majority of the court holding that the Legislature had not yet attempted to delegate to the Public Service Commission the power to abrogate conditions in respect of fares contained in franchise agreements between municipalities and railroads when the agreements were already in existence at the time of the adoption of the statute, pointing out that three successive Legislatures after the decision of the *Quinby* case had been asked to confer such power upon the Public Service Commission and that in each year the bills embodying the proposed enlargement of jurisdiction had failed and stated that if the legislative intention has been misread, the Legislature by amendment must say so, and set the reading right.

Judge McLaughlin, in a dissenting opinion, construed certain sections of the Railroad Law in connection with the Public Service Commissions Law as conferring the disputed power upon the Public Service Commission so far as the particular railway under consideration was concerned. He said: " The State, acting through the Legislature, has, by virtue of its police power, the right to regulate the fare to be charged by a street surface railroad corporation. This right or power, whichever it may be called, is an attribute of the State sovereignty. It is something which the State cannot sell or give away, either in whole or in part. It is a power which underlies the Constitution and is predicated upon the law of necessity. It belongs to the State because it is sovereign, and is a necessity for the existence of the government. It is something the State cannot surrender because to do so would be to surrender a sovereign power. It is as enduring and indestructible as the State itself. (*People* v. *Adirondack Ry. Co.*, 160 N. Y. 225.) All contracts and property rights are held subject to the fair exercise of this power which embraces, among other things, regulations designed to promote public

convenience and general welfare, as well as those in the interest of the public health, morals and safety.  *  *  *  Contracts cannot be made which in any way impair or limit this power, nor can one Legislature limit or control a subsequent one in its exercise.  *  *  *  [Art. 3, section 18, of the Constitution] does not in any way affect the right or power of the State to fix and regulate the fare to be charged by a public service corporation.  This provision of the Constitution is not, either by express language or implication, a surrender by the State to property owners or to the municipalities of the supreme right to govern or regulate the fares or charges of street surface railroad corporations as the public welfare or interest necessitates or demands.  It is simply a limitation upon the general power of the Legislature; a limitation, however, in one respect only, and that is that the Legislature shall not pass a law authorizing the construction of a street surface railroad which does not enact that the designated consents shall be first obtained.  The provision has no bearing whatever upon the inherent power of the State to regulate the fare to be charged by a public service corporation.  The power to regulate such fares is essentially a legislative function. [*Home Tel. & Tel. Co.* v. *City of Los Angeles*, 211 U. S. 265; *Union Dry Goods Co.* v. *Georgia P. S. Corp.*, 248 U. S. 372.] The power to thus legislate, under the Constitution, is lodged in the Senate and Assembly.  (Art. 3, sec. 1.)  A municipality is a mere agent of the State.  It can only do what the State authorizes it to do.  All the power it has comes from the State and this it may at any time recall. While the power to regulate fares is a legislative function, the State may delegate its exercise to an agent.  *  *  * The constitutional right of the city was to consent or not to consent.  With the choice of these alternatives the Legislature had no conern and no power to compel action one way or the other.  On the other hand, if a fare were fixed in the consent, it was not binding upon the State, since it might at any time be changed.  *  *  *  If it be true, as indicated, that the State, as an attribute of sovereignty in the exercise of police power, has the right to regulate fares of a public service corporation, with the right to delegate such power to an agent, the inquiry necessarily follows,  *  *  *  whether it has,

in fact, delegated this power to the Public Service Commission. * * * No rule of law is better settled than that a municipality cannot, by a contract with a public service corporation, bar the Legislature, so far as fares are concerned, from changing or abrogating such contract when made. All such contracts are, as heretofore pointed out, made subject to future action of the Legislature. Both parties contract with reference to the exercise of that power. [Citing cases.] * * * The State may increase or diminish a rate fixed in a franchise or contract. This is so well settled that the citation of authorities ought not to be necessary. It is the Federal rule. * * * It is the rule established in many of the States."

Judge CARDOZO, while he concurred with the majority in upholding the ruling in the *Quinby* case, said: " I do not say that it is beyond the power of the Legislature, either directly or through a commission, to abrogate or modify the conditions of a franchise. If such a question were here, I might agree in that respect with Judge MCLAUGHLIN." Judge ELKUS concurred in the memorandum of Judge CARDOZO, Judge CHASE and Judge COLLIN concurred with Judge MCLAUGHLIN and Judge ANDREWS also concurred in so much of the opinion of Judge MCLAUGHLIN as holds that the Legislature has constitutional power to modify rates fixed in a local franchise.

It thus appears that four of the learned judges of the Court of Appeals absolutely and two inferentially sustain the constitutional power of the Legislature to modify rates fixed in local franchises. With the plain intimations contained in the former decisions cited and the direct ruling and invitation to the Legislature to amend the law if it intended to exercise the power, at its next session it passed the act now under consideration which in " clear and definite language confers power upon the Commission to increase rates above the amounts fixed in the grants or consents."

In *People ex rel. City of New York* v. *Nixon* (229 N. Y. 356) Judge CARDOZO, in alluding to the *Quinby* and other like cases, said: " We did not hold that there was any constitutional restraint upon the grant of such a power. Restraint under the

Federal Constitution, there certainly was none. [Citing cases.] We left open the question whether there was any under the Constitution of the State."

It seems to us that the question is now settled beyond reasonable doubt.

Article 6 of the Public Service Commission Law (as added by Laws of 1921, chap. 134), being sections 105 to 111, inclusive, thereof, is also attacked. It provides in brief that after making the necessary studies and investigation the Transit Commission shall prepare a plan of readjustment for the relief of the emergency declared to exist, and for the improvement of transit in the city. Upon the completion of the plan and before adopting the same it shall hold a public hearing, shall transmit a copy to the local authorities of the city and to each of the railroads included therein, with a request for the statement of the views of such local authority and such railroad companies. There are provisions for full and due hearings and opportunity for approval of the complete plan and contracts, and on failure of the city authorities to approve, further public hearings are to be had and if changes are made again the plan and contracts are to be submitted to the city for its approval, and if there is final disapproval the Commission is authorized to execute and deliver such contract or contracts in the name and behalf of the city. The respondents again invoke the contract clause of the Federal Constitution (Art. 1, § 10, subd. 1) alleging that the proposed action would result in violation of their existing contract rights.

The question here presented is not now ripe for decision. No action has been taken. No plan has been prepared or submitted. No contracts have been drawn. It is a matter of common knowledge that *intra mural* transportation matters are in a deplorable condition. It may be that the plan devised will be so sound, so safe, so .conservative, so fair and reasonable, that it will be willingly accepted by all parties. There is no question but that the city has the power to approve of modifications of existing contracts. The existing contracts between the city and the Interborough and Brooklyn Union Elevated Railroad Companies came under judicial scrutiny in *Admiral Realty Co.* v. *City of New York* (206 N. Y.

110).   At page 130 Judge HISCOCK for the court said: " The question whether the city may make this arrangement with the Interborough Company seems to resolve itself into the fundamental inquiry whether a municipality having made a contract may subsequently bargain under full legislative authority for a modification of that contract so that it will be adjustable to altered and then existing circumstances, paying an adequate consideration either for what the other party gives up or for what it secures under the modifications.   It seems to me obvious that a municipality has such power.   It is an ordinary incident to the power to make a contract that one who has made such a contract which through inadvertent provisions or change in conditions becomes undesirable may bargain for a modification or cancellation thereof.   The power to make a contract begets the right to procure its amendment or rescission.   I can see no reason why this principle applicable to an individual should not be applied to a municipality in such a case as the present one and why we should not hold even without guiding authority that a municipality which had the power to make a contract for the operation of subways may secure modifications thereof when it has become inadequate to meet existing conditions."

The respondents have argued almost every conceivable question that could be raised in opposition to this application.   Many have no relevancy at the present time.   We have considered the vital ones and reach the conclusion that the applications should be granted.

DOWLING, SMITH, PAGE and GREENBAUM, JJ., concur.

Applications granted.   Settle orders on notice.